UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

Daniel Scott Peterson                          Case No. 18-29081-beh
*dba* DC Boatlift, Dock & Trailer LLC,

                    Debtor.                     Chapter 7

Herbert J Cuene, Jr. and
DC Docks and Boatlifts, Inc.,

                    Plaintiffs,

v.                                             Adversary No. 18-2259-beh

Daniel Scott Peterson,

                    Defendant.

**DECISION ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

In October 2012, plaintiff Herbert Cuene purchased a business known as
DC Boatlift Dock & Trailer from defendant Daniel Peterson.  The parties'
subsequent business relationship was anything but smooth sailing.  Within a
year Peterson sued Cuene and his new business (renamed "DC Docks and Boat
Lifts, Inc.") in state court, seeking, among other things, replevin of personal
property that Peterson alleged was not included in the sale.  Cuene
counterclaimed, asserting several causes of action including intentional
misrepresentation and theft.  Cuene succeeded on his counterclaim and was
awarded a default judgment of over $400,000.

Cuene then attempted to collect on his judgment by executing against
several parcels of real estate owned by Peterson.  Peterson, in turn, asserted
that the property was not owned by *him*, but by various trusts to which he had

transferred the property for estate planning purposes—meaning the property could not be reached by his creditors to satisfy judgments against him. The Door County Circuit Court disagreed. It found that the trusts at issue were nothing more than Peterson's alter egos, and therefore the real property titled to them could be reached by Peterson's creditors. Shortly after Cuene tried to execute against some of this real property, Peterson filed a Chapter 7 bankruptcy.

Cuene filed a proof of claim in the bankruptcy for over $450,000. He also brought this adversary proceeding seeking an order either denying Peterson a discharge under 11 U.S.C. § 727(a)(4)(A) or, alternatively, holding that the debt owed to Cuene is non-dischargeable under 11 U.S.C. § 523(a)(2)(B) and/or (a)(6). Cuene has asked this Court to grant him summary judgment on his causes of action under sections 727(a)(4)(A) and 523(a)(2)(B). Peterson objects.

For the reasons set forth below, the Court concludes that there are no genuine issues of material fact and that Cuene is entitled to judgment as a matter of law on his claim under section 727(a)(4)(A). The Court therefore grants summary judgment to Cuene on Count III of the complaint. The Court also holds, in the alternative, that issue preclusion applies with respect to the state court default judgment against Peterson, and that, as a result, all elements of Cuene's claim under section 523(a)(2)(B), other than "reasonable reliance," have been established as a matter of law.

The Court has jurisdiction under 28 U.S.C. § 1334 and the Eastern District of Wisconsin's July 16, 1984, order of reference entered under 28 U.S.C. § 157(a). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(I) and (J). This decision constitutes the Court's findings of fact and conclusions of law under Fed. R. Bankr. P. 7052.

# FACTS

The following facts, taken from the parties' summary judgment briefing and other public records of which the Court may take judicial notice,[1] are either undisputed, or not subject to reasonable dispute. They describe two separate state court actions, one of which was appealed, together spanning five years.

## A.    The 2013 Door County Litigation

On April 24, 2013, Peterson, through an attorney, filed a lawsuit against the plaintiffs in the Circuit Court for Door County, Wisconsin, Case No. 13-CV-81. Two other entities were also plaintiffs – EZ Marketing Trust and DC Boatlift Dock & Trailer LLC. In response, Cuene and DC Docks and Boat Lifts, Inc. filed an answer and counterclaim. The parties engaged in discovery through 2015. Without his counsel, Peterson filed an amended complaint, alleging he had been assigned all rights owned by EZ Marketing Trust and DC Docks and Boat Lifts against Cuene et al. Peterson appeared at several hearings in the case, including a September 23, 2014 status conference, a November 25, 2014 hearing on Cuene's motion to compel discovery (which the circuit court judge, Peter Diltz, granted), a March 3, 2015 hearing on Cuene's motion for leave to file a second amended counterclaim (which the judge also granted), and a May 1, 2015 hearing on Peterson's attorney's motion to withdraw as counsel (which the judge also granted).

Cuene filed his second amended counterclaim on July 29, 2015. The second amended counterclaim alleged five causes of action, for: (1) intentional misrepresentation, (2) breach of contract, (3) misrepresentation under Wis. Stat.

---

[1] Certain facts taken from the two proceedings held before the Door County Circuit Court, discussed herein, are matters of public record available via an online database commonly known as CCAP (Consolidated Court Automation Programs). The Court may take judicial notice of state court dockets under Federal Rule of Evidence 201. *See, e.g., Guaranty Bank v. Chubb Corp.,* 538 F.3d 587, 591 (7th Cir. 2008) ("a court is of course entitled to take judicial notice of judicial proceedings"); *United States v. Doyle,* 121 F.3d 1078, 1088 (7th Cir. 1997) (taking judicial notice of district court's docket sheet); *see also Watton v. Hegerty,* 2007 WI App 267, ¶ 26 n.17, 306 Wis. 2d 542, 744 N.W.2d 619 (noting that CCAP records for a Milwaukee County Circuit Court case are "public records of which we may take judicial notice"), *reversed on other grounds,* 2008 WI 74; *Keller v. Patterson,* 2012 WI App 78, ¶ 16, 343 Wis. 2d 569, 819 N.W.2d 841 (explaining that filing of petitions and complaint created a public record available on CCAP).

§ 100.18, (4) civil theft under Wis. Stat. § 895.446, and (5) breach of implied warranty. *See* ECF Doc. No. 18, at 56–63, Exhibit 13. The allegations relate to a 2012 transaction in which Cuene purchased the business known as DC Boatlift Dock & Trailer from Peterson. *See id.* Relevant here, Cuene's second amended counterclaim alleged that:

1. In August 2012, Peterson and Cuene entered into a contract for the sale and purchase of the business known as DC Boatlift Dock & Trailer.

2. Prior to signing the sale contract, Peterson provided Cuene income statements and tax returns.

3. As a term and condition of the sale, prior to closing, Peterson also was required to provide Cuene financial statements and tax returns, along with other documents regarding the financial performance and day-to-day operations of the business.

4. As part of the required disclosure, Peterson provided Cuene with what he represented to be:

   a) A 2010 income statement of the business, and the 2010 tax return filed by the business with the IRS;

   b) A 2011 income statement of the business and the 2011 tax return filed by the business with the IRS;

   c) A projected business income statement for 2012; and

   d) A document itemizing the inventory of the business, identifying the actual cost the business paid for each item in inventory.

5. The tax returns Peterson provided Cuene were not the actual returns filed with the IRS, and differed significantly from the actual returns, overstating net profits by over $120,000 for each year.

6. The tax returns and income statements Peterson provided to Cuene contained numbers that were fabricated with the intention of enticing a potential buyer into purchasing the business.

7. The inventory list that Peterson provided to Cuene did not include actual costs and inflated the cost value of the inventory by 10%.

8. Peterson knew the representations in the documents were untrue and made them with the intent to deceive and induce Cuene into purchasing the business.

9. Cuene believed the representations in the documents were true and relied on them to his detriment in purchasing the business at a significantly overstated value.

*Id.* ¶¶ 2–17.

In September 2015, Peterson, *pro se*, filed a motion to dismiss the second amended counterclaim. The court held a hearing on the motion on December 1, 2015 and asked the parties to brief the issue. Judge Diltz subsequently denied the motion in a March 8, 2016 decision. *See* ECF Doc. No. 18, at 64–65, Exhibit 14.

On April 11, 2016, Cuene filed a motion for default judgment. Judge Diltz granted the motion on April 25, 2016. The order for default judgment provided that Cuene and his business, DC Docks and Boat Lifts, Inc., were "entitled to default judgment on their second amended counterclaim jointly and severally against Daniel S. Peterson and DC Boatlift Dock & Trailer, LLC." *Id.* The order also provided that the court would schedule a hearing to determine the amount of damages to be awarded. *Id.*

The court held an evidentiary hearing on damages on August 9, 2016. Judge Donald Zuidmulder presided. The public docket for the case describes the hearing as follows: "Plaintiff Daniel S. Peterson in court. Attorney Curtis R. Czachor in court for Defendant Herbert J. Cuene, Defendant DC Docks and Boat Lifts, Inc., Third party plaintiff Herbert J. Cuene, and Third party plaintiff DC Docks and Boatlifts, Inc. Defendant Herbert J. Cuene in court. Plaintiff objects to testimony being taken, voluntarily leaves courtroom after outbursts. Testimony taken. Court takes recess. Plaintiff returns to courtroom. Court makes ruling."

At the August 9 evidentiary hearing, Cuene presented testimony, as well as the following documents:

1. Schedule C from Peterson's 2010 and 2011 tax returns, which Cuene testified Peterson provided him before closing and represented to Cuene that they were the tax returns filed with the IRS (*see* ECF Doc. No. 34, at 113–14, Exhibits 4 and 5);

2. A business income statement that Cuene testified Peterson provided him before closing, which purports to contain actual income figures for 2010, 2011, and income projections for 2012 (*see id.* at 115, Exhibit 6);

3. Schedule C from the 2010 and 2011 tax returns that Peterson actually filed with the IRS (*see id.* at 116–17, Exhibits 7 and 8);

4. Closing statements from the sale, which show a purchase price of $500,000 for the business ($230,000 for goodwill, $30,000 for a non-compete, $30,000 for equipment), and $140,000 for inventory (*see id.* at 119–20, Exhibits 10 and 11); and

5. A handwritten inventory sheet prepared by Peterson purporting to identify the actual cost the business paid for each item in inventory, given to Cuene before closing (*see id.* at 121, Exhibit 12).

After considering the evidence presented, Judge Zuidmulder made the following findings on the record:

> Satisfied on this record that the purchase in this case was fraudulently induced; that the numbers that were presented in this closing statement are simply a figment of somebody's imagination, because they're not rooted in any documents that I can determine.  So . . . the measure of damages that the Court is satisfied the law establishes would be, what was the purchase price at the time this business was purchased, what was the business's actual value, and the difference between the purchase price and the actual value is the damages.

> . . . [T]he real estate was worth $127,000. . . . I'm satisfied that there was no goodwill, and that the non-compete agreement has no value . . . .  [T]he $140,000 worth of inventory should be reduced by at least 12 percent, which [is] $105,359.   . . . [T]ogether, that comes to $232,359.  Then if you subtract the $232,359 from the $640,000 paid, I'm going to award a judgment to [Cuene] in this case of $408,000 . . . .

> . . . I will certainly say that the record supports the fact that this was a grossly fraudulent transaction.

*See* ECF Doc. No. 18, at 67–73, Exhibit 15.

Judge Zuidmulder issued an order and judgment on August 16, 2016. Peterson appealed the judgment on September 26, 2016 on jurisdictional grounds, and the Court of Appeals later affirmed the circuit court (on January 31, 2018) in a summary disposition.

On September 22, 2016, in connection with Cuene's attempt to locate assets against which to collect the judgment, Door County Court Commissioner Nina Martel issued a "Second Order for Examination," requiring Peterson to appear before the commissioner on October 17, 2016 and testify about his property, assets and income and to produce related documentation. *See* ECF Doc. No. 34, at 3–6, Exhibit 1. Peterson appeared at the examination but did not bring any documentation with him. *See id.* at 17–20, Exhibit 2. He also claimed that the money judgment issued by Judge Zuidmulder was "void because there was no jurisdiction when that was given." *Id.* at 15. Peterson refused to answer questions about his assets and was later held in contempt for his failure to comply with the examination order. *See id.* at 31–32, Exhibit 3.

**B.     The 2016 Door County Litigation**

On September 20, 2016, Cuene filed a lawsuit against Peterson and others in an attempt to collect on the judgment, Door County Case No. 16-CV-175. In that lawsuit, Cuene requested a judgment declaring that several parcels of real estate titled in the names of various trusts were subject to execution to satisfy the judgment against Peterson. *See* ECF Doc. No. 18, at 12–20, Exhibit 3. The property included:

- Real estate (a 60-acre farm) located at 4216 State Highway 57, Sturgeon Bay, Door County, WI, consisting of two parcels: a 58-acre parcel including a home and outbuildings, titled in the name of Life and Times II Trust, and a 3-acre parcel of vacant land titled in the name of Life and Times III Trust.
- Real estate located in the Town of Wausaukee, Marinette County, WI, consisting of two parcels, titled in the name of Life and Times IV Trust.

Cuene also requested a declaratory judgment that the net proceeds from the sale of Peterson's marital home, located at 1799 Morning View Road, Brussels, WI, and owned by Tracy Delsart, were subject to execution. The net proceeds totaled $165,114.02. *See id.* at 13.

A trial was held on May 7, 2018. Peterson participated in and testified at that trial. *See id.* at 12–14. On August 17, 2018, Circuit Court Judge Ehlers issued a decision, in which he made the following findings:

1. Contrary to Peterson's claims that the four parcels of previously-mentioned real estate in Door County and Marinette County were owned by "Life and Times LLC" and/or "Sunrise Prize Trust," the real estate instead was owned by the Life and Times Trusts II, III, and IV, and "Sunrise Prize and Life and Times LLC have no relevancy to these proceedings."

2. Under the Wisconsin doctrine of alter ego in reverse, "the Life and Times Trusts II, III, and IV were nothing more than alter egos of Peterson. . . . There are virtually no factors in this case that support the separate legal existence of the entities known as Life and Times II Trust, Life and Times III Trust or Life and Times IV Trust. These entities were at all times treated as alter egos of Peterson. He treated the four parcels titled in the name of those trusts as his own before and after their 2012 transfers. As such, the properties titled in those trusts will be subject to the claims of the Plaintiffs in this matter."

*Id.* at 14–18.

The circuit court therefore granted judgment in the plaintiffs' favor, declaring that the four parcels of property at issue "are subject to plaintiffs' judgment in Door County case number 13 CV 81 and plaintiffs may execute on said parcels." ECF Doc. No. 18, at 21–22, Exhibit 4. As for the proceeds of the sale of the marital property, the court stated in its August 17, 2018 decision:

> Because I have found that the Plaintiffs may execute on four parcels of property now titled in trusts which are alter egos of Peterson, I . . . do not address at this time the Plaintiffs' claim to those sale proceeds.
>
> I conclude that equity mandates that the Plaintiffs first pursue execution on these four parcels of real estate before I need to consider the Plaintiffs' claim to the Morning View property proceeds. The Plaintiffs' execution on the four parcels of property may very well satisfy the Plaintiffs' judgment in Case No. 13CV81 in full.

The Court added: "If it becomes necessary that I sort out [Mr. Peterson's marital interest in the property] in comparison to Delsart's interest in those proceeds in order to determine whether any of those sale proceeds will be used to satisfy

Peterson's obligations in Case No. 13CV81, I will reserve those issues for a future determination."  ECF Doc. No. 18, at 19, Exhibit 3.

Peterson did not appeal the ruling.

On September 21, 2018, the plaintiffs filed a writ of execution in Door County Circuit Court against the Door County property.  ECF Doc. No. 18, at 33–37, Exhibit 5.

## C.    The Bankruptcy Filing

Three days after the writ of execution was issued, on September 24, 2018, Peterson filed a Chapter 7 bankruptcy petition.  On his Schedule A/B, filed on October 9, 2018, Peterson did not disclose any interest in: (1) the Door County property; (2) the Marinette County property; (3) proceeds from the sale of the marital property in Brussels; or (4) any trusts, including the "Life and Times" II, III, or IV Trusts.

At his section 341 meeting of creditors on December 5, 2018, Peterson acknowledged that Judge Ehlers had concluded Peterson had an interest in real property, but asserted that Judge Ehlers was wrong in so deciding.  Peterson contended that he "contracted away" his real estate in 2011, and that "[t]he judge cannot step between a contract. A federal contract. It's not a statutory contract."  ECF Doc. No. 33, at 12, 13.  Peterson also testified that he filed bankruptcy "for the judgement [that Cuene obtained]. The illegitimate, diabolical scheme that they were involved in with fraud to try to take money from me that was unjust."  *Id.* at 12.

Likewise, in answering the plaintiffs' complaint, Peterson denied that Door County Case No. 16-CV-175 resulted in a valid and enforceable judgment, describing Judge Ehlers's decision as a "void ab initio non-judgment" because the "Judge ruled as though these were statutory trusts" rather than "common law - contract trusts - pure trusts," which are "not under the jurisdiction of the legislative statutory Courts . . . [and are] protected by Article 1 Section 10 of the constitution whereby, no state may create any law/legislation that would impair the obligations of a contract."  ECF Doc. No. 10, at 14; *see also id.* at 16 ("The

Contract is irrevocable and not statutory leaving no discretion for ANY judge to legislate judgments that are contrary to or in contempt of Article 1 section 10 of the Constitution, or any of the law that controls Contracts.").

Peterson also filed a claim in his own bankruptcy case for an unknown amount, claiming to be a secured creditor.[2]

## D.   The Parties' Arguments

Cuene asserts that Judge Ehlers's decision is entitled to preclusive effect, meaning that Peterson may not challenge the determination that he owns the real estate at issue.  As a result, Peterson's refusal to recognize the legitimacy of the ruling, and his intentional failure to disclose his property interests, constitute a false oath warranting denial of discharge under section 727(a)(4)(A).

---

[2]  The proof of claim is supported by documentation including a UCC financing statement that appears to list Peterson's birth certificate as collateral; a June 13, 2018 advertisement placed in the Green Bay Press-Gazette that purports to provide legal notice that Peterson's birth certificate has been reclaimed from the State of Wisconsin and the United States of America; an "affidavit of ownership" in which Peterson avers that he is the holder in due course of his birth certificate; and an "affidavit/memorandum of facts" in which Peterson makes statements about a bankrupt U.S. government, and a "mongrelized" court system.  These documents, as well as other documents Peterson has filed in this adversary proceeding and his main bankruptcy case, reflect a theory characteristic of the "sovereign citizen" movement:

> As explained by the FBI, "Sovereign citizens view the USG [U.S. government] as bankrupt and without tangible assets; therefore, the USG is believed to use citizens to back U.S. currency. Sovereign citizens believe the USG operates solely on a credit system using American citizens as collateral. . . ." Federal Bureau of Investigation, "Sovereign Citizens: An Introduction for Law Enforcement" 3 (Nov. 2010), http://info.public intelligence.net/FBI–SovereignCitizens.pdf (visited March 6, 2013).

*El v. AmeriCredit Fin. Servs., Inc.*, 710 F.3d 748, 750 (7th Cir. 2013).  *See also United States v. Anzaldi*, 800 F.3d 872, 875 (7th Cir. 2015) (describing the "redemption theory" as a "sovereign citizen-type view which . . . holds that the federal government went bankrupt when it abandoned the gold standard in 1933 and began converting the physical bodies of its citizens into assets against which it could sell bonds. A tenet of this view is that knowledgeable citizens can redeem these assets and, through manipulating them in various imagined accounts, use them to their advantage.").  The Seventh Circuit has repeatedly rejected theories such as this in various contexts.  *See, e.g.*, *United States v. Benabe*, 654 F.3d 753, 767 (7th Cir. 2011) ("Regardless of an individual's claimed status of descent, be it as a 'sovereign citizen,' a 'secured-party creditor,' or a 'flesh-and-blood human being,' that person is not beyond the jurisdiction of the courts.  These theories should be rejected summarily, however they are presented.") (citing cases).  Moreover, adherents of the Sovereign Citizens movement often look to maritime law for their assertions, but they do not accept the limitations of admiralty jurisdiction to maritime activities.  *El v. AmeriCredit,* 710 F.3d at 750–51.

Cuene points to several other instances in which Peterson has refused to accept the authority of state court rulings as part of an overall effort to hinder, delay, and obstruct collection of Cuene's judgment, both before and after filing this bankruptcy. According to Cuene, Peterson's pattern of concealment amounts to a reckless disregard for the truth sufficient to establish an intent to defraud.

Cuene similarly asserts that the default judgment issued by Judge Diltz, and the corresponding findings of fact made by Judge Zuidmulder in the 2013 Door County litigation, are entitled to preclusive effect here and establish all elements necessary to state a cause of action for nondischargeability under section 523(a)(2)(B).

Peterson responds with several arguments, many of which appear unrelated to the issues raised in the plaintiffs' motion for summary judgment.[3] After careful review of the briefing and the parties' further explication at oral argument, the Court understands Peterson's objections as they pertain to the specific causes of action at issue, to be as follows:

With respect to the section 727(a)(4)(A) claim, Peterson continues to maintain, as he did in Door County Case No. 16-CV-175, that the property at issue belongs to the Sunrise Prize Trust, and therefore that he has no interests in the property to disclose.[4] As a result, he denies any intent to deceive or defraud in failing to disclose property that he does not own.

Regarding the section 523(a)(2)(B) claim, Peterson attacks the underlying state court judgment as being obtained via fraud, and therefore void as a matter of law. He further asserts that he did not provide Cuene any false documents in

---

[3] Among other things, Peterson charges Cuene and his attorney with filing a fraudulent proof of claim because it does not contain a "wet ink" stamp; claims that the Chapter 7 trustee is aiding and abetting the fraudulent scheme of Cuene and his attorney; and accuses the Chapter 7 trustee, this Court, and the Clerk of the Bankruptcy Court with malfeasance, apparently for not acting as his personally appointed "fiduciary trustees."

[4] A Mr. James Steele, allegedly a trustee of the "Sunrise Prize, CT, CL," which may be related to one of the trusts the Door County court found to be merely an alter ego of Mr. Peterson, filed additional documents on this Court's docket on June 10, 2019. ECF Doc. No. 39. Identical copies were also filed on the docket of Mr. Peterson's main bankruptcy case. Those documents were not filed until after briefing and hearing was concluded in this matter, nor were they filed with affidavit testimony, and have not been considered as part of the record for this decision.

connection with the 2012 sale of his business, contrary to Cuene's claims and the state court's findings of fact.

## ANALYSIS

Summary judgment is appropriate if the pleadings and affidavits on file show there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (incorporated by Fed. R. Bankr. P. 7056). At the summary judgment stage, the Court's role is *not* to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial—"whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986). A factual dispute is "genuine" only if there is sufficient evidence for a reasonable fact-finder to find in favor of the nonmoving party. *Id.* at 249. For a fact to be material, it must be "outcome determinative under governing law." *Contreras v. City of Chicago*, 119 F.3d 1286, 1291–92 (7th Cir. 1997).

The moving party bears the burden of establishing that there is no genuine issue about any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether there is a genuine issue of material fact, the Court must view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 436–37 (7th Cir. 2000).

### A.    Section 727(a)(4)(A)

Cuene first seeks summary judgment on his cause of action for denial of Peterson's discharge under 11 U.S.C § 727(a)(4)(A). That section provides: "The court shall grant the debtor a discharge, unless . . . the debtor knowingly and fraudulently, in or in connection with the case— . . . made a false oath or account . . . ." 11 U.S.C § 727(a)(4)(A).

To establish grounds for a denial of discharge under 727(a)(4)(A), the moving party must prove, by a preponderance of the evidence, that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with intent to defraud; and (5) the statement related to the bankruptcy case in a material way. *Stamat v. Neary (In re Stamat),* 635 F.3d 974, 978 (7th Cir. 2011).

For purposes of the plaintiffs' motion for summary judgment, the false statements at issue are Peterson's failure to disclose his interest in real property in Door County and Marinette County, as well as his interests in any trusts, both in his bankruptcy schedules and at his section 341 meeting of creditors. "Omissions from bankruptcy schedules and statement of financial affairs constitute a false oath for purposes of section 727(a)(4)(A)." *Layng v. Sgambati (In re Sgambati),* 584 B.R. 865, 871 (Bankr. E.D. Wis. 2018). False testimony given during a section 341 creditors meeting also constitutes a false statement. *In re Senese,* 245 B.R. 565, 574 (Bankr. N.D. Ill. 2000). Additionally, a statement is "material" if it "bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." *Stamat,* 635 F.3d at 982.

To determine whether Peterson's statements are "false," the Court first must decide whether Judge Ehlers's ruling that Peterson *does* have an interest in the real estate—and that his trusts are his alter egos—is entitled to preclusive effect. As a matter of full faith and credit, a federal court must apply the forum state's law of issue preclusion in determining the preclusive effect of a state court judgment. 28 U.S.C. § 1738; *Dollie's Playhouse, Inc. v. Nable Excavating, Inc. (In re Dollie's Playhouse, Inc.),* 481 F.3d 998, 1000 (7th Cir. 2007). Here, the judgment at issue was rendered in Wisconsin state court, so Wisconsin law on preclusion applies. *See, e.g., Smith v. Kleynerman (In re Kleynerman),* No. 18-26659-BEH, 2019 WL 1111569, at *2 (Bankr. E.D. Wis. Mar. 8, 2019), citing *In re Larsen,* 422 B.R. 913, 920 (Bankr. E.D. Wis. 2010).

"Wisconsin law on issue preclusion forecloses relitigation in a subsequent action of an issue of law or fact if two elements are present: (1) whether the issue was actually litigated in a prior action and was necessary to the judgment, and (2) whether the application of issue preclusion would be fundamentally unfair." *In re Pulvermacher*, 567 B.R. 881, 889 (Bankr. W.D. Wis. 2017). In undertaking the "fundamental fairness" analysis, the Court may consider:

> (1) could the party against whom preclusion is sought, as a matter of law, have obtained review of the judgment; (2) is the question one of law that involves two distinct claims or intervening contextual shifts in the law; (3) do significant differences in the quality or extensiveness of proceedings between the two courts warrant relitigation of the issue; (4) have the burdens of persuasion shifted such that the party seeking preclusion had a lower burden of persuasion in the first trial than in the second; or (5) are matters of public policy and individual circumstances involved that would render the application of issue preclusion to be fundamentally unfair, including inadequate opportunity or incentive to obtain a full and fair adjudication in the initial action?

*In re Kleynerman*, 2019 WL 1111569, at *4, citing *In re Larsen*, 422 B.R. at 920; *Michelle T. v. Crozier*, 173 Wis. 2d 681, 689, 495 N.W.2d 327 (1993).

As set forth in the litigation history above, the question of Peterson's ownership interest in the real estate was the precise issue in dispute in the 2016 Door County case. Peterson actively participated in that litigation, offering exhibits and testimony at trial in support of his arguments that he had no interest in the property. Judge Ehlers disagreed and issued a valid final judgment determining that Peterson *did* have interests in the property, which could be attached by creditors. Peterson chose not to appeal that judgment. In the circumstances, the Court concludes that it is not fundamentally unfair to apply issue preclusion. Peterson is therefore precluded from relitigating whether he owns the real property in Door County and Marinette County, and whether the Life and Times II, III, and IV Trusts are his alter egos. Peterson's statements to the contrary (via omissions in his schedules and testimony at his section 341 meeting) are false.

Moreover, when he made these statements, Peterson *knew* they conflicted with a valid final state court order—and thus were false—notwithstanding Peterson's personal beliefs or theories to the contrary. *See also In re Retz*, 606 F.3d 1189, 1198 (9th Cir. 2010) (for purposes of section 727(a)(4)(A), "[a] debtor acts knowingly if he or she acts deliberately and consciously") (internal quotation marks omitted). Peterson's statements, which concerned substantial estate assets, related materially to his bankruptcy. This leaves the Court to consider only whether the fourth element, fraudulent intent, has been established as a matter of law.

To establish an intent to defraud, "[t]he plaintiff must prove the omissions are the fruit of an intent to deceive, or form a pattern of reckless indifference to the truth." *In re Sgambati*, 584 B.R. at 871. "A debtor's honest confusion or lack of understanding may weigh against a finding of fraudulent intent." *Id.* Additionally, "[a] false oath made inadvertently, under a mistaken belief, or even carelessly is not grounds for denial of discharge." *In re Lee*, 415 B.R. 367, 375 (Bankr. E.D. Wis. 2009).

While fraudulent intent is a question of fact that is rarely suitable for determination on summary judgment—*see, e.g., In re Salgado*, 588 B.R. 209, 214 (Bankr. N.D. Ill. 2018)*; In re Hartford*, 525 B.R. 895, 903 (Bankr. N.D. Ill. 2015)—there are certain situations where summary judgment on a fraud claim may be appropriate:

> A denial of knowledge may be so utterly implausible in light of conceded or irrefutable evidence that no rational person could believe it; and if so, there is no occasion to submit the issue of knowledge to determination at a trial. . . . [C]redibility issues are to be left to the trier of fact to resolve on the basis of oral testimony *except* in extreme cases. The exceptional category is—exceptional. For the case to be classified as extreme, the testimony sought to be withheld from the trier of fact must be not just implausible, but utterly implausible in light of all relevant circumstances.

*In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998).

In *Chavin*, the Seventh Circuit affirmed the bankruptcy court's denial of a debtor's discharge under section 727(a)(2) and (a)(4)(A) on summary judgment,

explaining that the case fit "the exceptional category" because the debtor—who was a mature and experienced businessman with properties worth millions of dollars—provided "ridiculous" explanations for his failure to answer simple questions correctly, explanations which no reasonable person could believe. For example: (1) though the debtor was the president and sole shareholder of a real estate management company, he did not list his position as president or his stock ownership in response to questions about both office and stock ownership, attributing the latter omission to a belief that the stock was worthless; (2) the debtor tried to explain his failure to disclose a partnership interest in commercial real estate by saying that the partnership dissolved a few weeks before the bankruptcy, but could not substantiate that claim after his partner denied under oath that the partnership had dissolved that early; (3) the debtor "failed to disclose a valuable stock option on the preposterous ground— one he could not, as an experienced businessman, have believed—that because the option was not assignable, it had no value"; and (4) the debtor failed to disclose $1.6 million in income because a paralegal didn't ask him about it. 150 F.3d at 729.

Similarly, in *In re Boba*, 280 B.R. 430, 435 (Bankr. N.D. Ill. 2002), the bankruptcy court granted summary judgment on the plaintiff's claims under sections 727(a)(2)(A) and (a)(4)(A), based on the debtor's failure to schedule voluntary transfers of property to his spouse in an apparently collusive, eve-of-bankruptcy "fast-track divorce," while continuing to enjoy the beneficial use of the assets transferred, as well as his ownership in a corporation that was his primary source of income. The court explained, in relevant part:

> Could a factfinder credit Debtor's statements for why he acted as he did? No. His explanations are utterly implausible. Just as in *Chavin,* Debtor here was a businessman who had to understand his responsibility to disclose accurately and fully the information requested on the bankruptcy schedules. . . .
>
> . . . Likewise, the explanations for not scheduling all assets of Debtor hold no water.

> . . . Debtor's voluntary transfers of property to his spouse and failure to comply with reporting requirements in bankruptcy showed a deliberate intent to shield his assets from creditors. No reasonable factfinder could decide that Debtor's acts and omissions lacked intent to defraud.

280 B.R. at 435-36. *See also In re Holstein*, 299 B.R. 211, 233 (Bankr. N.D. Ill. 2003), *aff'd*, No. 03 C 8023, 2004 WL 2075442 (N.D. Ill. Aug. 31, 2004) ("No trial is necessary to reject the suggestion that all the while he was receiving partnership checks and endorsing them to his lover, [the debtor]—a licensed attorney for nearly 40 years—'actually thought' he owned no interest in the partnerships, only achieving enlightenment on the subject three years later at the hands of the Circuit Court. . . . [The debtor] plainly knew he owned the interests. His contrary assertion, frankly, is preposterous. Preposterous factual assertions will not prevent summary judgment.").

Here, it is preposterous to assert, as Peterson does, that a valid state court judgment is illegitimate and void because the judge refused to accept Peterson's proposition that so-called "pure contract" trusts are outside the bounds of state law—itself a baseless argument.[5] Peterson is not an "unsophisticated" consumer. He has owned at least two businesses, and represented himself in this and other litigation *pro se*. He acknowledged creating, or attempting to create trusts as estate-planning tools. Peterson must understand that he has a duty to disclose accurately and fully the information required by the Bankruptcy Code, regardless of his beliefs about the legitimacy of state courts or their rulings. "The Code requires a full and complete disclosure by a debtor of interests of any kind. . . . The requirements of full disclosure include disclosing debts with which a debtor disagrees." *In re Sgambati*, 584 B.R at 874.

Peterson's misguided notions about trust law, the U.S. Constitution, the freedom to contract, and the jurisdiction of state and federal courts represent more than just a "mistaken belief." Peterson has persisted in floating his

---

[5] *See supra* n.2.

rudderless theories despite being made aware that they lacked legal merit by at least one state court and by the Chapter 7 bankruptcy trustee. What's more, Peterson previously has been advised—not just by this Court—that the proper place for redressing any grievances with state court judgments is through the state court appellate process, not the federal court system: "[W]hen a litigant is unhappy with how his state proceedings went, the proper course is to file an appeal, not to sue the individuals involved in federal court. . . . 'If petitioner believes that his rights are being violated in the context of his state court case, he may raise his concerns with [that judge] or file an appeal in state court. However, petitioner may not make an end run around the state judicial process . . . by filing an action in federal court.'" *Peterson v. Cuene*, No. 17-C-151, 2017 WL 5891321, at *1 (E.D. Wis. Feb. 3, 2017).

Peterson's sustained disregard for the validity and finality of state court judgments, and his apparent effort to use the bankruptcy court to rehash old complaints, raises doubts about the sincerity of his claims. *See, e.g., In re Bechard*, No. 14-11862-13, 2014 WL 3671419, at *6 (Bankr. W.D. Wis. July 21, 2014) ("Counsel's repeated disregard of [the Court's] instructions [that it is constrained by specific jurisdictional and constitutional limits and will abstain from hearing matters to avoid violating those limits] leaves questions in the Court's mind as to the genuineness of the jurisdictional arguments made by [counsel].").[6]

At the very least, Peterson's conduct amounts to reckless indifference to the truth, which is the legal equivalent of fraudulent intent. No reasonable factfinder could conclude otherwise. Peterson's denial of an intent to defraud is no harbor against summary judgment here. The undisputed evidence suffices to show that Peterson made false oaths within the meaning of section

---

[6] Peterson acknowledged at the hearing on summary judgment that the references in his written response to purported "malfeasance" of the Chapter 7 trustee, the Clerk of the Bankruptcy Court and this Court itself all concerned his continued argument that those entities were his personally appointed "fiduciary trustees." The Court previously deemed those purported appointments null and void, and frivolous. ECF Doc. No. 21.

727(a)(4)(A) by failing to disclose his real property interests and trust interests both in his schedules and during his meeting of creditors. Summary judgment on this cause of action is therefore appropriate.

Alternately, even if the Court decided not to deny Peterson's entire discharge, Peterson nevertheless would be precluded from challenging certain findings made by the Door County Circuit Court relative to Cuene's cause of action under section 523(a)(2)(B), as explained in more detail below.

**B.      Section 523(a)(2)(B)**

Section 523(a)(2)(B) excepts from discharge debts for money, property, or services obtained by false written statements "respecting the debtor's or an insider's financial condition." To prevail under § 523(a)(2)(B), a plaintiff must prove the following elements:

(1)  the debtor made a statement in writing;

(2)  the statement was materially false;

(3)  the statement concerned the debtor's or an insider's financial condition;

(4)  in making the statement, the debtor had an intent to deceive the creditor; and

(5)  the creditor actually and reasonably relied upon the statement.

*In re Draper*, No. 17-26352-BEH, 2018 WL 6252865, at *5 (Bankr. E.D. Wis. Nov. 27, 2018) (citing *Fischer Inv. Capital, Inc. v. Cohen (In re Cohen)*, 507 F. 3d 610, 613 (7th Cir. 2007); *City Nat. Bank of Florida v. Sheridan (In re Sheridan)*, 57 F. 3d 627, 633 (7th Cir. 1995)).

Cuene asserts that Judge Diltz's April 25, 2016 order for default judgment in the 2013 Door County litigation, followed by Judge Zuidmulder's August 9, 2016 findings of fact, and the resulting money judgment entered in Door County Case No. 13-CV-81 are entitled to preclusive effect and establish all elements of the plaintiffs' claim under section 523(a)(2)(B) as a matter of law.

As noted above, because the judgment at issue was entered by the Door County Circuit Court, Wisconsin issue preclusion law applies. The Court therefore must consider two criteria: (1) whether the question at issue was

"actually litigated" and necessary to the judgment; and (2) whether it would be fundamentally fair to employ issue preclusion in the circumstances. Because the order at issue here is for a *default* judgment, the Court's issue preclusion analysis becomes more complicated.

As a general rule, judgments procured by default don't satisfy the first issue-preclusion requirement, because none of the issues were actually litigated. *Heggy v. Grutzner,* 156 Wis. 2d 186, 193, 456 N.W.2d 845 (Ct. App. 1990). There is, however, an exception to this general rule: "[E]ven if [an issue] was not litigated, the party's reasons for not litigating in the prior action may be such that preclusion would be appropriate." *Id.* at 193. *See also Deminsky v. Arlington Plastics Machines*, 2001 WI App 287, ¶ 40, 249 Wis. 2d 441, 638 N.W.2d 331 ("'[P]olicy concern[s]' underlying the 'default judgment exception to the issue preclusion rule' might not always be present, and thus, there may be circumstances in which a party could or should be precluded from litigating an issue, notwithstanding the fact that the issue had been previously determined by default.").

In *Kelley v. Ahern*, 541 B.R. 860 (W.D. Wis. 2015), for example, the district court concluded that applying issue preclusion to a default judgment comported with "fundamental fairness" because the defendant had a full and fair opportunity to litigate in state court but made a tactical decision to avoid a trial. Specifically, the defendant "knew about the state court lawsuit and participated in the proceedings for almost three years, but he chose not to attend the trial without a legitimate excuse." 541 B.R. at 862. The court noted that the defendant "forced [the plaintiffs] to expend the time and resources necessary to litigate the case until the very end, defaulting only after the parties had been litigating for almost three years." *Id.* at 864. The court also rejected the defendant's argument that it would be unfair to apply issue preclusion because he was proceeding *pro se* at the time of the trial due to his inability to continue paying his lawyer, pointing out that the defendant continued to litigate *pro se* "for almost two years" before the default, making it "difficult to see [the

defendant's] decision to skip the trial as anything other than a tactical decision." *Id.*

Here, as in *Kelley*, Peterson had a full and fair opportunity to litigate the state court issues. He defaulted only after participating in the case for several years, creating legal costs for the plaintiffs, and then filing a motion to dismiss that ultimately was denied (a decision he also appealed). Peterson appeared briefly at the August 2016 hearing on damages, and for apparently tactical reasons, declined to introduce evidence or testimony. In these circumstances, the Court does not find it fundamentally unfair that Peterson be bound by the state court default judgment.

The state court judgment is preclusive only as to the issues that it necessarily determined. There was no trial as to liability before the order for default judgment was entered on April 25, 2016, and the order itself makes no reference to any specific causes of action. Later, however, after an August 9, 2016 evidentiary hearing on damages, Judge Zuidmulder provided some clarity. He made several findings on the record, including that the debt at issue was "fraudulently induced." The state court's award of damages based on its finding of fraudulent inducement is consistent with a finding of liability for the plaintiff's claim of intentional misrepresentation. So, the Court now must determine whether a cause of action for intentional misrepresentation under Wisconsin common law requires the same findings as a claim under section 523(a)(2)(B).

In Wisconsin, to be entitled to damages for intentional misrepresentation (sometimes referred to as fraudulent misrepresentation or common-law fraud), a plaintiff must establish five elements:

(1) the defendant made a representation of material fact;

(2) the representation was false;

(3) the defendant made the representation either knowing it was untrue or with reckless disregard for its truth or falsity;

(4) the defendant intended to defraud/deceive and induce the plaintiff to act on the statement; and

(5) the plaintiff justifiably relied on the statement to his/her detriment.

*See Ollerman v. O'Rourke Co.*, 94 Wis. 2d 17, 43 n.26, 288 N.W.2d 95 (1980); Wis JI–Civil 2401; *see also Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶ 12, 283 Wis. 2d 555, 699 N.W.2d 205; *Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, ¶ 13, 270 Wis. 2d 146, 677 N.W.2d 233.

Although in the last two decades Wisconsin courts have sometimes used the terms "justifiable reliance" and "reasonable reliance" interchangeably,[7] the two types of reliance are not the same, at least for purposes of section 523(a)(2). Reasonable reliance is a higher standard than justifiable reliance, and incorporates an objective "reasonable person" test, which entails a duty to investigate. *See Field v. Mans*, 516 U.S. 59, 77 (1995). Justifiable reliance, on the other hand, depends on "the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Id.* at 70–71 (quoting Restatement (Second) of Torts, § 545A, Comment *b* (1976)).

Because justifiable reliance is a "less demanding" standard than reasonable reliance, a person may be "justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Id.* at 70 (quoting Restatement (Second) of Torts, § 540). An investigation is required to satisfy the justifiable reliance standard only if there are red flags or other warning signs suggesting possible misrepresentation. *See id.* at 70 ("It is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a

---

[7] *See, e.g., State v. Abbott Labs.*, 2012 WI 62, ¶ 52, 341 Wis. 2d 510, 816 N.W.2d 145 (listing elements of fraud to include "justifiable" reliance, while later in the same paragraph identifying "the presence of reasonable reliance" as an element of common law fraud); *Novell v. Migliaccio*, 2008 WI 44, ¶ 70 (Ziegler, J., concurring) ("The second and third elements of a Wis. Stat. § 100.18 claim include reasonable or justifiable reliance as a consideration.").

warning that he is being deceived, that he is required to make an investigation of his own.'") (quoting W. Prosser, Law of Torts § 108, p. 718 (4th ed. 1971)).

A review of the applicable Wisconsin case law establishes that a common law claim for intentional misrepresentation requires a showing of "justifiable" reliance in substance—even if courts sometimes refer to this standard as "reasonable reliance" in name.[8]  For this reason, a finding of liability for intentional misrepresentation under Wisconsin common law is insufficient to establish the "reasonable reliance" element of § 523(a)(2)(B).[9]

But Judge Zuidmulder's finding that Cuene was fraudulently induced to purchase Peterson's business after being supplied copies of Peterson's tax returns and other financial documents *is* sufficient to preclusively establish *all*

---

[8]  For example, in *Williams v. Rank & Son Buick, Inc.*, the Wisconsin Supreme Court articulated the level of reliance required to prevail on a common law fraud claim as "justified" and employed an individualized, rather than an objective "reasonable person," standard.  *See* 44 Wis. 2d 239, 245–47, 170 N.W.2d 807 (1969) (noting that "courts will refuse to act for the relief of one claiming to have been misled by another's statements who blindly acts in disregard of knowledge of their falsity or with such opportunity that by the exercise of ordinary observation, not necessarily by search, he would have known," and phrasing the ultimate question as "whether the statement's falsity could have been detected by ordinary observation . . . [or] ordinary care," which is "to be determined in light of the intelligence and experience of the misled individual . . . [and] the relationship between the parties").  That same year, *Williams'* "justifiable reliance" standard was incorporated into the Wisconsin jury instruction for intentional misrepresentation.  *See First Credit Corp. v. Behrend*, 45 Wis. 2d 243, 251, 172 N.W.2d 668 (1969) ("If you find, however, that the plaintiff or person to whom the representations were made knew them to be untrue, then there can be no justifiable reliance as nobody has the right to rely upon representations that he knew were untrue.") (quoting Wisconsin Jury Instructions—Civil 2401).

Although in more recent years, courts have couched the applicable standard as one of "reasonable reliance"—a trend that perhaps began with *Ollerman v. O'Rourke Co.*, 94 Wis. 2d 17, 26, 288 N.W.2d 95 (1980) ("[t]he gravamen of [intentional misrepresentation] is the nature of the false words used and the reliance which they may reasonably induce")—the substance of the standard remains the same "ordinary care" test articulated in *Williams*.  *See, e.g.*, *Douglas-Hanson Co. v. BF Goodrich Co.*, 229 Wis. 2d 132, at 144 n.2 (Ct. App. 1999) (citing *Williams* for the proposition that a claim of fraudulent inducement requires that "the detrimental reliance must be reasonable"); *Kailin v. Armstrong*, 2002 WI App 70, ¶ 31 (citing *Douglas-Hanson* for the proposition that fraudulent inducement requires "reasonable" reliance); *K & S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 2007 WI 70, ¶ 36 (regarding "reasonable reliance" as the standard for common law causes of action for misrepresentation, citing to *Kailin*, 2002 WI App 70, ¶ 40).

[9]  Nor is a finding of liability under Wis. Stat. § 100.18 sufficient to do so.  *See Novell v. Migliaccio*, 2008 WI 44, ¶ 27 (neither reasonable nor justifiable reliance is an element of a claim under Wis. Stat. § 100.18).

*other* elements of Cuene's claim under section 523(a)(2)(B). Peterson made false statements in writing by reporting inaccurate numbers on his tax returns, income statements, and inventory sheets. The statements were materially false and were made with an intent to deceive. While the state court was not required to find that the statements at issue were ones concerning the debtor's or an insider's financial condition, the Court is satisfied that this element is established as a matter of law. Peterson's tax returns, as well as income statements and inventory lists concerning his sole proprietorship, are statements concerning the debtor's financial condition. As a result, all elements of Cuene's claim under section 523(a)(2)(B) except for reasonable reliance have been established as a matter of law. The only question of fact appropriate for a trial would be whether Cuene's reliance—which the state court necessarily determined was justifiable—was also reasonable.

Therefore, as an alternate holding, the Court concludes that Cuene has met his burden to establish all elements of a claim under section 523(a)(2)(B), except for reasonable reliance. Because the Court is granting summary judgment on Cuene's claim under section 727(a)(4)(A), meaning that his debt will not be discharged, a trial to determine the reasonableness of his reliance is unnecessary.

## CONCLUSION

For the foregoing reasons, the plaintiffs are awarded summary judgment on Count III of the complaint, and Peterson will be denied a discharge under 11 U.S.C. § 727(a)(4)(A). The Court will enter a separate order consistent with this decision.

Dated: July 9, 2019

By the Court:

Beth E. Hanan
United States Bankruptcy Judge